# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| FRANCES GECKER, solely as Chapter 7 Trustee of the bankruptcy estate of Ark Discovery II, LP, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 14 C 8447 |
| v. | ) ) | Magistrate Judge Sidney I. Schenkier |
| GENERAL ELECTRIC CAPITAL CORPORATION, | ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER[1]

On October 27, 2014, plaintiff Frances Gecker, as Chapter 7 trustee of the bankruptcy estate of Ark Discovery II, LP ("Ark"), filed a complaint against defendant General Electric Capital Corporation ("GECC"), alleging that GECC participated in a civil conspiracy to commit fraud and aided and abetted fraud by entering into an implicit agreement with Thomas Petters ("Petters") and two of his entities -- Petters Capital, Inc. and Redtag -- to perpetuate a Ponzi scheme. Plaintiff alleges that as a result of Petters's Ponzi scheme, Ark was misled into extending millions of dollars in loans to a phantom supply chain financing business, which were never repaid. Plaintiff seeks to recover Ark's losses of more than $100 million on account of GECC's alleged tortious contributions to the success of the Ponzi Scheme (doc. # 1: Compl. ¶ 6).

Defendant has moved to dismiss plaintiff's complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) on the grounds that: (1) plaintiff does not have standing to sue GECC for aiding and abetting or conspiracy; (2) plaintiff's claims are deficient as a matter of

---

[1]On March 17, 2015, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. ## 32, 33).

law; and (3) plaintiff's claims are untimely (doc. # 41: Mem. in Supp. of Def.'s Mot to Dismiss at 1-2). The motion has now been fully briefed. For the reasons that follow, we grant defendant's motion to dismiss (doc. # 40).

I.

We set forth the material factual allegations in the complaint, which the Court accepts as true solely for the purpose of this motion. We supplement those allegations with information from documents in the public record, which we may judicially notice without converting the motion to dismiss into a motion for summary judgment. *Pugh v. Tribune Co.*, 521 F.3d 686, 691 (7th Cir. 2008).

A.

Beginning in 1994, Petters, through Petters Company, Inc. ("PCI"), operated a multi-billion dollar Ponzi Scheme over the course of nearly fifteen years. PCI formed special purpose entities ("SPEs") ostensibly to purchase certain consumer electronics at below wholesale prices, and then to resell them to big box retailers such as Costco. Petters lured investors to advance billions of dollars to fund this enterprise, but unbeknownst to them, there were no true retailers and virtually no merchandise, and the lenders were repaid from monies sourced from other defrauded lenders (Compl. ¶¶ 15-17, 21).

In 1998, defendant GECC, a sophisticated commercial lender, agreed to extend a $50 million line of credit to Petters Capital, an SPE, to finance Petters Capital's purchase of electronics merchandise for resale to Costco and other retailers (Compl. ¶ 27). In return, Petters Capital agreed to pay GECC interest and fees, including "success fees" (generally totaling 10 percent of the purported profit for each transaction) predicated on Petters Capital's gross profit margin on its sale of merchandise (*Id.* ¶ 28). GECC took a security interest in substantially all of

Petters Capital's assets, including the purported accounts receivable generated from merchandise sales, whose proceeds were to be paid by the retailers directly into a lockbox account controlled by GECC (*Id.* ¶ 30). On or about December 17, 1999, Redtag, another SPE, entered into a $55 million line of credit with GECC ostensibly to finance the purchase of electronic merchandise over the internet (*Id.* ¶ 31).

In May 2000, GECC learned that accounts receivable in connection with Costco purchases from Petters Capital appeared to have aged past 120 days (Compl. ¶ 32). GECC initiated collection efforts, and prepared a document for Mr. Petters to give to the purchasing arm of Costco requesting verification of outstanding accounts receivable for more than $52 million in purported purchase orders issued by Costco to Petters Capital (*Id.* ¶ 33). Mr. Petters never forwarded the verification request, instead forging a signature purporting to verify the phony purchase orders (*Id.* ¶ 34).[2] On June 23, 2000, GECC's Senior Vice President, Paul Feehan, demanded that Petters Capital forward endorsed Costco checks directly to GECC instead of issuing checks to GECC from its own bank account as it had been doing (*Id.* ¶ 36). Petters Capital never did so, and instead made payment to GECC through checks drawn on Petters Capital's bank account (*Id.* ¶ 38). Nonetheless, in early July 2000, GECC approved another loan of $1.67 million to Petters Capital to fund a Costco deal (*Id.* ¶ 39).

On October 9, 2000, GECC terminated the Petters Capital line of credit, and Petters Capital agreed to pay amounts GECC claimed due totaling $45,891,229.62, which included $400,695.63 in success fees (Compl. ¶ 41). On or around October 23, 2000, Mr. Feehan asked Costco to verify whether any amounts remained unpaid in connection with 14 purchase orders, totaling approximately $59,615,246.00 (*Id.* ¶ 42). A Costco employee informed Mr. Feehan that Costco had not issued any of the purchase orders (*Id.* ¶ 43). When confronted, Mr. Petters told

---

[2]Plaintiff does not allege that GECC knew of the forgery.

Mr. Feehan that he would pay GECC off with money from new investors, and Petters Capital paid GECC $46,048,347.00 as payment in full by December 7, 2000 (*Id.* ¶¶ 50, 54). GECC provided Mr. Petters with a UCC-3 termination statement, but that statement was not filed at the time (*Id.* ¶ 99).

On or around December 20, 2000, Mr. Petters contacted Mr. Feehan about making a draw under the Redtag line of credit, ostensibly to fund the purchase of merchandise (Compl. ¶ 56). At Mr. Petters's criminal trial in October 2009, Mr. Feehan testified that back in December 2000, he questioned Mr. Petters about whether that money would simply refinance the investors who refinanced GECC in the Petters Capital facility (*Id.* ¶ 57). In response, Mr. Petters faxed Mr. Feehan copies of eleven checks from Costco, purporting to show that the previous purchase orders had been paid off, and that the Redtag merchandise was free and clear (*Id.* ¶¶ 58-59). Nevertheless, Mr. Feehan directed Jack Morrone, the GECC account representative for the Petters accounts, to contact the bank from which the checks were drawn (*Id.* ¶ 60).

As a result of that inquiry, GECC learned that the amounts that had actually cleared were millions of dollars less than the amounts set forth on the checks Mr. Petters had provided (Compl. ¶ 61). When confronted, Mr. Petters told Mr. Feehan that the bank had erred, but Mr. Feehan did not believe him (*Id.* ¶ 63). Mr. Feehan asked Mr. Petters for copies of the bank statements showing that the amounts had actually been deposited and cleared, but Mr. Petters never produced them (*Id.* ¶¶ 63-66). Plaintiff does not allege that GECC provided the requested funding to Redtag.

On December 27, 2000, GECC received a letter from Redtag requesting information, including the nature of any defaults, in connection with Ernst & Young's audit of Redtag's 2000 year-end financial statements (Compl. ¶ 68). In its response to E & Y, dated January 30, 2001,

the only default identified by GECC was a "net worth covenant" (*Id.* ¶ 70). GECC did not notify E & Y, law enforcement, or New York State banking regulators of the Costco checks and purchase orders that GECC had discovered were false (*Id.* ¶¶ 71, 79, 83). By the end of March 2001, the Redtag line of credit was closed and its amounts due paid in full to GECC, ending GECC's lending relationship with Mr. Petters and his related companies (*Id.* ¶ 78).

## B.

In or around October 2002, PBFP Holdings, LLC, agreed to become a secured lender to Petters Capital, but it refused to extend financing when it discovered that GECC's UCC-1 financing statement was still in effect (Compl. ¶¶ 100-02). Although GECC had provided Mr. Petters with a UCC-3 termination statement in December 2000 when the Petters Capital debt was fully paid, that statement had not been filed (*Id.* ¶ 99). On February 20, 2003, a Petters employee asked GECC to terminate two outstanding UCC-1 financing statements, which GECC did (*Id.* ¶¶ 103, 106).

## C.

More than four years later, on July 5, 2007, AtoZ Investors Fund (the predecessor in interest to Ark) agreed to lend funds to Edge One, LLC (an SPE created and owned by PCI), on a transaction-by-transaction basis to purchase certain overstock and discontinued electronic merchandise for sale to various big box retailers, including Costco, in return for which Ark would be paid interest and fees from the profits from the sales (Compl. ¶¶ 108-09, 125). Ark operated for the sole purpose of extending receivables-based financing to Edge One (*Id.* ¶ 15). From approximately October 1, 2007 through September 3, 2008, Ark made thirty loans to Edge One, totaling $159,010,000.00, and additional loans totaling $6 million to Petters Group Worldwide, LLC, another company owned and controlled by Mr. Petters (*Id.* ¶ 122). Ark's

insurers sought access to Mr. Petters's warehouses to inspect the merchandise that was purportedly purchased with Ark's loans, but the inspections were postponed and ultimately never took place (*Id.* ¶ 119). In August 2008, payments due to Ark under the agreement ceased; Ark was informed on a number of occasions that payments were delayed due to late shipments (*Id.* ¶ 120).

## D.

Thereafter, on or around September 24, 2008, Ark learned that search warrants had been executed at Mr. Petters's companies (Compl. ¶ 121). On October 3, 2008, Mr. Petters was arrested (*Id.* ¶ 22) and charged with creating and executing "a scheme and artifice to defraud and to obtain money and property by means of material false statements and false representations" from approximately January 1, 2000 through October 2, 2008. Criminal Complaint, *United States v. Petters, et al.*, No. 08-MJ-364(FLN) (D. Minn. Oct. 2, 2008), ECF No. 26. Among other things, the criminal complaint issued against Mr. Petters disclosed that the scheme involved the use of "entirely fabricated" purchase orders and other documents "to induce investors to invest money" (*Id.*, Aff. in Supp. of Crim. Compl., ¶ 7(d)). On that same date, the United States District Court for the District of Minnesota placed PCI into receivership in civil litigation commenced by the United States against Mr. Petters, PCI and others pursuant to 18 U.S.C. § 1345, which is entitled "Injunctions against fraud" (Compl. ¶ 127). The appointed receiver, Douglas Kelley, filed Chapter 11 bankruptcy petitions for Mr. Petters, PCI, the SPEs, and other Petters affiliated entities in the United States Bankruptcy Court for the District of Minnesota, and Mr. Kelley was appointed Chapter 11 trustee (*Id.* ¶ 128).

Mr. Petters's criminal trial began in October 2009. Plaintiff contends that GECC's alleged involvement in the Ponzi scheme "was not generally known" until October 29, 2009,

when Messrs. Feehan and Morrone testified at the trial that GECC discovered in October 2000 that the business GECC had been financing through the Petters Capital line of credit was a fiction (Compl. ¶¶ 26, 32, 42-53). On December 2, 2009, Petters was convicted of 20 criminal charges, including wire and mail fraud (*Id.* ¶ 23).

By then, many creditors of the Petters bankruptcy estates had filed claims in the pending bankruptcy cases. On December 16, 2008, Ark filed claims as a creditor in the pending bankruptcy cases of Edge One, PCI and PGW on account of its losses in connection with its loans (Compl. ¶¶ 130-31). On May 22, 2009, an involuntary Chapter 7 bankruptcy petition was filed against Ark, and on June 23, 2009, the United States Bankruptcy Court for the Northern District of Illinois entered an order for relief under Chapter 7 of the Bankruptcy Code (*Id.* ¶ 7).

### E.

On October 8, 2010, Mr. Kelley (as Trustee) filed a complaint in the Minnesota Bankruptcy Court against GECC seeking turnover of any and all transfers and pay-offs made by PCI, Petters Capital, or any other debtor or affiliate of PCI to GECC on the grounds that they constituted "property of the estate to be recovered and administered by the trustee" and preserved for the benefit of defrauded creditors (Def.'s Mot., Ex. 14: Kelley Compl. against GECC ¶¶ 21-23, 82-83). Mr. Kelley cited the fraudulent Costco checks and purchase orders as evidence, among other, that GECC participated in and benefited from the Petters Ponzi scheme with the actual intent to hinder, delay or defraud creditors (*Id.* ¶¶ 61-62). The Kelley complaint alleged thirteen counts of fraudulent transfer and sought to recover the following amounts: (1) approximately $48 million PCI paid GECC to pay off the Petters Capital line of credit (*Id.* ¶ 64); (2) $230 million PCI and Petters Capital fraudulently transferred to GECC from 1998 through 2000 under the Petters Capital line of credit, minus the $48 million pay-off (approximately $185

million) (*Id.* ¶ 66); and (3) approximately $60 million GECC received in fraudulent transfers from Redtag, or, in the alternative, over $6.4 million in false profits related to Redtag funding transfers (*Id.* ¶¶ 70-71). In addition, the Kelley complaint contained counts for disallowance, lien avoidance, equitable subordination and unjust enrichment/equitable disgorgement (on the grounds that all funds received by GECC were inextricably intertwined with the Ponzi scheme and derived from monies fraudulently obtained by Mr. Petters and PCI from other investors or participants in the Ponzi scheme) (*see, generally, Id.* ¶¶ 157-75).

On June 20, 2012, the Minnesota Bankruptcy Court approved a settlement agreement between Mr. Kelley and GECC, stating that approval of the settlement agreement was in the best interests of the debtors, their creditors, their estates, and other parties in interest (Def's Mot., Ex. 15 at 3). Under the settlement, GECC agreed to pay $19 million in "full, final and complete settlement of all claims that the debtors, Petters Estates, the Trustee or the Receiver have released and not reserved in this Agreement against the GECC Released Parties" (*Id.*, Ex. A ¶ 2). On November 22, 2013, the Bankruptcy Court of Minnesota granted Mr. Kelley's motion for substantive consolidation of the bankruptcy estates of PCI and its related debtors, including the SPEs. *In re Petters Co., Inc.*, 506 B.R. 784 (Bankr. D. Minn. 2013).

## II.

Plaintiff filed her two-count fraud complaint against GECC in this Court on October 27, 2014. Plaintiff claims that Ark reasonably relied on misrepresentations by Mr. Petters, Edge One, PCI and their agents that they were engaged in a legitimate supply chain financing business, and that Ark suffered millions of dollars in losses from the loans it extended to Edge One (Compl. ¶¶ 125-26, 143). Plaintiff contends that GECC is liable for the harm Ark suffered, because GECC conspired with Mr. Petters and his entities to commit fraud, and aided and abetted that fraud, by

helping to perpetuate the Ponzi scheme in return for payment in full of GECC's loans plus a success fee from so-called new investors (*Id.* ¶¶ 4, 137). More specifically, plaintiff contends that GECC entered into an "implicit agreement" with Mr. Petters to help ensure the Ponzi scheme would evade detection and continue defrauding investors in the years to come. Plaintiff alleges that as part of this implicit agreement, GECC falsified its own books and records by improperly booking success fees as legitimate fees earned; continued to do business with Mr. Petters after discovering the Ponzi scheme; failed to report the Ponzi scheme; knowingly misled E & Y in its audit of Redtag's 2000 financial statements; and authorized termination of two outstanding financing statements in connection with the Petters Capital facility (*Id.* ¶¶ 67-107, 133-35). Plaintiff seeks compensatory damages from the harm to Ark's bankruptcy estate and its creditors in the amount of $107,207,101.00, the total amount Ark loaned to Edge One and PGW, minus the payments PCI made to Ark and the partial interest in certain loans that Ark sold (*Id.* ¶¶ 122-24, 137, 147).

Defendant argues that plaintiff's complaint should be dismissed for (1) lack of standing, (2) failure to state a claim, and (3) failure to file within the applicable statute of limitations period (Def.'s Mem. at 1). When analyzing a motion to dismiss for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6), "[o]ur analysis rests on the complaint, and we construe it in the light most favorable to the plaintiffs, accepting as true all well-pleaded facts alleged and drawing all permissible inferences in their favor." *Fortres Grand Corp. v. Warner Bros. Entm't Inc.*, 763 F.3d 696, 700 (7th Cir. 2014). "And while a complaint does not need 'detailed factual allegations' to survive a 12(b)(6) motion to dismiss, it must allege sufficient facts to 'state a claim to relief that is plausible on its face.'" *League of Women Voters of Chi. v. City of Chi.*, 757 F.3d 722, 724 (7th Cir. 2014) (quoting *Bell Atl. Corp.*

*v. Twombly*, 550 U.S. 544, 570 (2007)). To satisfy the plausibility standard, the plaintiff must plead allegations that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), which means "more than a sheer possibility that a defendant has acted unlawfully." *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 887 (7th Cir. 2012) (internal quotations and citations omitted).

State law governs the causes of action that can be asserted by a bankruptcy trustee and creditors. *Koch Ref. v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1348 (7th Cir. 1987). However, while the nature of a debtor's interest in property is determined by state law, the question of whether the resulting interest should count as "property of the estate" is an issue of federal bankruptcy law. *Fisher v. Apostolou*, 155 F.3d 876, 880 (7th Cir. 1998). The parties agree that Minnesota or Illinois law applies, but that the choice of law determination is not necessary at this stage (doc. # 45: Pl.'s Resp. at 17 n.3; Def.'s Mem. at 8 n.2). We defer to the parties' choice to apply both Minnesota and Illinois law at this stage as there is no conflict between the relevant state law doctrines that affects our analysis. *See Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 729 (7th Cir. 2014) (under Illinois law, a choice of law determination is required only when the moving party has established an actual conflict between state laws); *Archer Daniels Midland Co. v. Aon Risk Servs., Inc. of Minn.*, 356 F.3d 850, 854 (8th Cir. 2004) (same rule under Minnesota law).

### III.

Defendant argues that plaintiff does not have standing to sue GECC for aiding and abetting and conspiracy to commit fraud because those causes of action are property of the Petters bankruptcy estates (Def.'s Mem. at 8-9, 12-13). Most cases addressing the issue of whether a claim belongs to a bankruptcy trustee or a creditor -- including the Supreme Court in

*Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416 (1972) -- have used the term "standing" as the parties do in this case. However, the Seventh Circuit has recently clarified that whether a claim belongs to a bankruptcy trustee or a creditor is a question on the merits rather than one of standing because it asks whether Congress has given a trustee "authority" to pursue a certain kind of action. *Grede v. Bank of New York Mellon*, 598 F.3d 899, 900 (7th Cir. 2010). Nevertheless, the parties' use of the term "standing" rather than "authority" in this case makes no substantive difference to our analysis. Beyond a passing reference to Rule 12(b)(1), neither party presents any argument or evidence on the matter of subject matter jurisdiction, and we do not see a subject matter jurisdiction issue in this case. Accordingly, we proceed -- as the parties have -- to whether plaintiff's complaint can survive defendant's motion to dismiss under Rule 12(b)(6).

## A.

The Bankruptcy Code defines "property of the estate" as comprising "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Once the bankruptcy petition has been filed, property rights belonging to a debtor under state law become assets of the estate. *Koch*, 831 F.2d at 1343-44. The purpose and duty of the trustee is to gather the estate's assets for *pro rata* distribution to the estate's creditors. *In re Teknek, LLC*, 563 F.3d 639, 645 (7th Cir. 2009). To that end, the trustee has the sole responsibility to represent the estate by bringing actions on its behalf, and the trustee has creditor status as the only party that can sue to represent the interests of the creditors as a class. *Id.* at 646 (citing 11 U.S.C. §§ 541, 544). "Whether the trustee is representing the estate or standing in the shoes of the creditors, he has the duty to marshal the debtor's property for the benefit of the estate, and thus the right to sue parties for recovery of all property available under state law." *Koch*, 831 F.2d at 1343 (internal quotations omitted). "The trustee's single effort eliminates the

many wasteful and competitive suits of individual creditors" and "protect[s] the creditors from one another." *Id.* at 1342-43 (internal citations and quotations omitted).

The trustee has the sole right and responsibility to bring so-called "general" claims on behalf of the estate and on behalf of creditors as a class, *Teknek*, 563 F.3d at 646; *i.e.*, claims that could be asserted by any creditor of the corporation. *Koch*, 831 F.2d at 1348-49. But the trustee has no standing to bring "*personal* claims" on behalf of only some creditors. *Id.* at 1348 (emphasis in original). Personal claims are "those in which the claimant has been harmed and no other claimant or creditor has an interest in the cause." *Teknek*, 563 F.3d at 646 (internal quotations and citations omitted). Individual creditors may bring personal claims that do not implicate the trustee's purpose of gathering the estate's assets for *pro rata* distribution to the estate's creditors. *Id.* Conversely, "a single creditor may not maintain an action on his own behalf against a corporation's fiduciaries if that creditor shares in an injury common to all creditors and has personally been injured only in an indirect manner." *Koch*, 831 F.2d at 1349.

Plaintiff notes that in *Steinberg v. Buczynski*, 40 F.3d 890, 893 (7th Cir. 1994), the Seventh Circuit opined that the terms "personal" and "general" are not illuminating in and of themselves (Pl.'s Resp. at 10). However, in that case, the appeals court went on to explain the meaning behind those terms in language akin to that used by the Seventh Circuit in *Teknek* and *Koch*:

> The point is simply that the trustee is confined to enforcing entitlements of the corporation. He has no right to enforce entitlements of a creditor. He represents the unsecured creditors of the corporation; and in that sense when he is suing on behalf of the corporation he is really suing on behalf of the creditors of the corporation. But there is a difference between a creditor's interest in the claims of the corporation against a third party, which are enforced by the trustee, and the creditor's own direct -- not derivative -- claim against the third party, which only the creditor himself can enforce.

*Steinberg*, 40 F.3d at 893. The Seventh Circuit has continued to utilize the terms "general" and "personal" to discuss whether claims may be brought by a trustee or a creditor, applying the same underlying concepts explained in *Steinberg*. *See, e.g., Teknek*, 563 F.3d at 646.

Plaintiff argues that its claims are based on the "direct harm" -- over $100 million in losses -- that Ark suffered "on account of the Ponzi Scheme" (Pl.'s Resp. at 7). However, suffering harm on account of the Ponzi scheme is not alone sufficient to confer authority on plaintiff to sue GECC for the harm Ark suffered. Plaintiff must show that GECC injured Ark not simply as a creditor of the Petters bankruptcy estate, in a way that was common to all creditors, but rather that GECC injured Ark directly in a way that no other creditor can claim.

Plaintiff does not satisfactorily explain how GECC directly injured Ark; nor does plaintiff address the glaring gap between GECC's actions and Ark's decision, years later, to loan money to Edge One. Plaintiff does not allege that any direct business relationship or dealings with GECC caused it to loan money to Edge One. Indeed, plaintiff does not allege that it even knew of GECC's dealings with the Petters entities until October 2009, long after Ark decided to make those loans. Instead, plaintiff argues that the Petters Trustee cannot assert conspiracy and aiding and abetting claims against GECC because GECC did not harm the Ponzi entities, but rather provided critical aid to them by concealing information that, if disclosed, would have exposed that the Petters enterprises were a fraud (Pl.'s Resp. at 10-12). From that premise, plaintiff leaps to the conclusion that because the Petters Trustee cannot bring conspiracy and aiding and abetting claims against GECC, plaintiff must have standing to bring those claims. We disagree with the conclusion -- and the premise is questionable as well.

**B.**

The question of whether the Ark trustee has standing to assert claims against GECC requires us to examine the nature of the injury she claims that Ark suffered at the hands of GECC. "[A] court must look to the injury for which relief is sought and consider whether it is peculiar and personal to the claimant or general and common to the corporation and creditors." *Koch*, 831 F.2d at 1349. "[T]he issue here is not what legal theories the [creditor] seeks recovery under. Rather, the relevant inquiry is whether the [creditor] suffered an injury personal to it distinguishable from harm suffered by all of the estate's creditors. . . . It is the conduct that causes the alleged injury, not the particular cause of action or other legal theory that determines whether the bankruptcy trustee has standing." *In re Pierport Dev. & Realty, Inc.*, 502 B.R. 819, 826 (Bankr. N.D. Ill. 2013). Otherwise, "all creditors' claims would be personal to the specific creditor: a supplier's claim for payment on supplies would be deemed personal because no other creditor could claim payment for the same supplies; an employee's claim for his back pay would be personal to the extent that no other employee could claim back pay for that employee's hours worked," and then no creditor would have to wait in line behind the bankruptcy trustee to assert his claims. *Teknek*, 563 F.3d at 644.

Here, plaintiff's complaint against GECC alleges that Ark was injured by the same conduct that the Petters Trustee, in its complaint against GECC, alleged harmed the bankruptcy estates: furthering the Ponzi scheme by concealing information that, if disclosed, would have exposed that the Petters enterprises were a fraud (*compare* Compl. ¶¶ 33-43, 53-61, *with* Def.'s Mem., Ex. 14: Complaint at ¶¶ 61-63, 70-72, *Kelley v. GECC*, No. 08-45257 (Bankr. D. Minn. Oct. 8, 2010)). While the causes of action, legal theories and damages amounts asserted by the Petters Trustee differed from those asserted here by plaintiff, "the injury for which relief is

sought" is not "peculiar and personal" to Ark, but "general and common to the corporation and creditors." *Koch*, 831 F.2d at 1349. Put another way, the GECC conduct that plaintiff alleges caused Ark to suffer harm is the same conduct that any entity that invested in the Petters entities (at least after 2003) could claim caused it to suffer harm. The conduct alleged, and the resulting harm, is not unique to Ark.

The relevant cases in this Circuit support this analysis. In *Koch*, for example, after the trustee sued to hold certain third parties liable for the corporation's debts under a veil-piercing theory, a group of creditors sued the same parties seeking a declaration that they were the corporation's alter egos. *Koch*, 831 F.2d at 1341. The Seventh Circuit held that the creditors' claims were essentially the same as the trustee's claims: the creditors sought recovery from injury caused by the third parties' misuse of the corporation. *Id.* at 1349. The court held that while the third parties injured the corporation directly, the creditors were only "indirect or secondary victims" because they alleged "nothing about their detrimental position that is peculiar and personal to them and not shared by [] other creditors." *Id.* Thus, the appellate court found that the creditors' claims were general and could be pursued only by the trustee in bankruptcy and affirmed the district court's dismissal of the creditors' complaint.

Similarly, in *Fisher*, the Seventh Circuit explained that to the extent the creditor-investors were suing the third parties to recover debts that arose out of the creditors' transactions with the debtor-corporation, "they stand in exactly the same position as the rest of the aggrieved investors, pursuing identical resources for redress of identical, if individual, harms." *Fisher*, 155 F.3d at 881-82 (reinstating bankruptcy court's injunction on creditor-investors' fraud claims that were closely related to the bankruptcy proceedings, though finding creditors' claims were not "property of" the bankruptcy estate because of the possibility some individual investors might be

able to demonstrate that the third parties' acts "imposed a separate and distinct injury" upon them); *cf. Teknek*, 563 F.3d at 649 (affirming district court's vacating of bankruptcy court's injunction where the creditor's claim against the third party alter egos did not depend on their misconduct with respect to the debtor). *See also Nat'l Am. Ins. Co. v. Ruppert Landscaping, Co.*, 187 F.3d 439, 441-42 (4th Cir. 1999) (affirming determination that creditors lacked standing to bring suit on claims that were similar in object and purpose and shared the "same underlying focus" as the trustee's fraudulent conveyance claim because although the creditors' claims did not contain identical elements, they depended on showing fraud or other unlawful action, and all creditors had a similar stake in such actions).

The bankruptcy courts in this District have applied these Seventh Circuit cases to enjoin creditors who sought to bring claims that substantially overlapped the trustee's claims, or that arose out of an alleged scheme to defraud that injured many of the debtor's creditors in the same way. *See, e.g., In re IFC Credit Corp.*, 422 B.R. 659, 663 (Bankr. N.D. Ill. 2010) (holding that the creditors' claims were not personal because there was substantial overlap between those claims and the claims contemplated by the trustee, they arose out of the same scheme that was allegedly used to mislead and defraud almost all of the debtor's creditors, and their injuries were identical to the injuries suffered by the general creditor body); *In re Lancelot Investors Fund, L.P.*, 408 B.R. 167, 172-73 (Bankr. N.D. Ill. 2009) (holding that fraud and negligence claims asserted by creditor-investor against a third party who provided auditing and financial services to Petters entities were general claims belonging to the bankruptcy estate because the alleged wrongs were suffered by many creditors who invested in the debtors and lost their investments because of the Ponzi scheme); *Pierport*, 502 B.R. at 828-29 (holding that under *Teknek*, creditor-union's claim against third parties for breach of collective bargaining agreement was personal

16

because it did not depend on the third parties' misconduct against the debtor and other creditors were not injured by the alleged breach, but that under *Koch*, the creditor's veil piercing claim could be pursued only by the trustee because the injury alleged was to the debtor-corporation, and the creditor did not allege that it was affected differently from other creditors).

In this case, the trustee seeks recovery for injury Ark suffered after loaning a Petters entity money in 2007 and 2008, an injury which Ark contends was caused by GECC's alleged actions in support of the Petters Ponzi scheme between 1998 and 2003. However, all creditors who invested in the Petters entities after 2003 could make the identical argument and claim the same injury -- that they lost money that they loaned to Mr. Petters and his entities because they did not know that the corporations were a sham. Unlike the facts in *Teknek* and *Fisher*, all of plaintiff's claims against GECC depend on GECC's alleged misconduct with respect to the Petters bankruptcy estates. Plaintiff itself had no direct dealings in this case with GECC and suffered no unique harm. Thus, we agree with defendant that plaintiff lacks authority to bring the claims in her complaint. To find otherwise would be to allow plaintiff to "artfully plead [her] way out of bankruptcy court." *Ruppert*, 187 F.3d at 442.[3]

---

[3]At least two other creditors in the Petters bankruptcy proceedings have attempted to sue GECC for fraud, aiding and abetting fraud, and conspiracy to commit fraud. Those cases do not address the issue of a creditor's or the Petters trustee's standing to sue on these claims. *See, e.g., Greenpond S., LLC v. Gen. Elec. Capital Corp.*, No. 14-1214, 2015 WL 225227 (D. Minn. Jan. 16, 2015) (holding that creditor's suit against GECC for aiding and abetting and conspiring to commit fraud -- on the grounds that creditor lost money it loaned to Petters entities after relying on GECC's actions in furtherance of Mr. Petters's fraud -- was "related to" bankruptcy proceedings, requiring abstention and remand to state court); *In re Palm Beach Fin. Partners, L.P.*, 517 B.R. 310 (Bankr. S.D. Fla. 2013) (denying GECC's motion to dismiss fraud suit by liquidating trustee for two large investors in the Petters' Ponzi scheme -- who claimed to have relied on Mr. Petters's former relationship with GECC and GECC's agreement to have Mr. Petters terminate GECC's financing statement -- because whether Minnesota or Illinois statute of limitations applied was issue of fact).

## C.

Having determined that plaintiff lacks standing to assert the conspiracy and aiding and abetting claims she asserts, we turn briefly to plaintiff's assertion that the Petters Trustee could not assert those claims either. We are not convinced that plaintiff's assertion is correct.

*First*, we are not persuaded that the Petters Trustee's failure to assert claims of conspiracy and aiding and abetting against GECC shows that the Mr. Kelley concluded that he lacked standing to do so. The fact that a party chooses not to assert certain claims may reflect, for example, a considered litigation judgment that the claims may not add value beyond that which could be achieved by the claims already plead, or that the claims may present obstacles of proof that makes it unwise to pursue them. A litigation judgment that a claim *should not* be pursued for those reasons is quite different from a judgment that a plaintiff *cannot* pursue a claim. Plaintiff here has offered no reason for us to assume that the Petters Trustee concluded he lacked authority to pursue the particular claims plaintiff asserts in this case.

*Second*, and in a related vein, plaintiff's argument that the Petters Trustee could not prove the conspiracy or aiding and abetting claims against GECC due to Mr. Petters's own fraudulent conduct (Pl.'s Resp. at 12) conflates standing to assert a claim with ultimate success in pursuing that claim. Having standing to assert a claim is no guarantee of success if the claim is pursued, and the fact that in bringing such claims, Mr. Kelley may have encountered difficulties of proof or a meritorious affirmative defense does not mean that he lacked standing to pursue the claims.[4]

---

[4]For example, an entity sued by a trustee in bankruptcy may assert the state law affirmative defense of *in pari delicto*, that "when the plaintiff is as culpable as the defendant, if not more so, the law will let the losses rest where they fell." *Peterson v. McGladrey, LLP*, No. 14-1986, 2015 WL 4092300, at *1 (7th Cir. July 7, 2015) (holding that *in pari delicto* applied to bar suit by mutual funds trustee for accounting malpractice against auditor for failing to discover that Mr. Petters's businesses were a sham because the funds committed fraud by lying to investors that payment came directly from Costco rather than a Petters-owned entity). *Cf. Scholes v. Lehmann*, 56 F.3d 750, 753-54 (7th Cir. 1995) (holding that *in pari delicto* did not apply in suit by receiver for debtor corporations used in Ponzi scheme to recover diverted funds from the beneficiaries of the diversions because mastermind of Ponzi scheme had been "ousted from control of and beneficial interest in the corporations," and

*Third*, we note that the Petters Trustee himself has asserted that claims like the ones asserted by plaintiff are property of the estate that belong to him, not to individual creditors. For example, in the Minnesota Bankruptcy Court, Mr. Kelley brought a motion to enjoin and enforce the automatic stay against Ritchie Capital Management and related entities, after they sued certain third parties, including Opportunity Finance, LLC and Sabes Family Foundation. Notice of Hr'g and Mot. of Chapter 11 Tr. for Prelim. Inj. and to Enforce the Automatic Stay at 3, *Kelley v. Ritchie Capital Mgmt., LLC.*, Adv. Case No. 13-4299 (Bankr. D. Minn. Aug. 29, 2014), ECF No. 30. Ritchie sued the third party defendants for aiding and abetting fraud, civil conspiracy and unjust enrichment. *Id.* at 11. Mr. Kelley, however, argued that the third party action was "based upon the very same facts, the very same conduct and the very same transactions at suit" in Mr. Kelley's complaint against those same defendants. *Id.* at 4.[5]

At bottom, the question of plaintiff's standing to pursue the claims asserted in this case does not turn on whether the Petters Trustee ultimately could have succeeded had he chosen to pursue them. Rather, whether plaintiff has standing here turns on whether the injury that Ark allegedly suffered by virtue of GECC's conduct is "separate and distinct" from the injury suffered by any creditor who loaned money to GECC. As we have explained above, it is not.

## IV.

In addition, we agree with GECC that, even if plaintiff had standing to purse the claims she asserts, those claims should be dismissed as untimely. The statute of limitations is an affirmative defense, which a complaint need not anticipate or attempt to plead around; thus, dismissal of a claim for untimeliness under Rule 12(b)(6) is "irregular." *Chicago Bldg. Design,*

---

"[f]reed from his spell," the debtor corporations became entitled to the return of the moneys for the benefit of innocent investors . . .").

[5]This motion is still pending.

*P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 613 (7th Cir. 2014). However, "irregular" does not mean "never appropriate." A motion to dismiss based on failure to comply with the statute of limitations should be granted where the plaintiff "affirmatively plead[s] himself out of court; the complaint must plainly reveal that the action is untimely under the governing statute of limitations." *Id.* at 613-14 (internal citations and quotations omitted). *See also Hollander v. Brown*, 457 F.3d 688, 691 n.1 (7th Cir. 2006) (same). Here, contrary to plaintiff's contentions, there is no "conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense." *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015).

As explained above, the parties address both Illinois and Minnesota law: plaintiff contends that the complaint is timely under both states' laws, and defendant contends that the complaint is untimely under either state's laws. In Illinois, 735 ILCS 5/13-205 provides the statute of limitations for fraud claims. *See Khan v. Deutsche Bank AG*, 978 N.E.2d 1020, 1028-29 (Ill. 2012). Section 205 states that "all civil actions not otherwise provided for, shall be commenced within 5 years next after the cause of action accrued." 735 ILCS 5/13-205. Minnesota law provides that a six-year statute of limitations applies to claims for relief on the grounds of fraud. M.S.A. § 541.05(1)(6).

Although not specified in 735 ILCS 5/13-205, the Illinois Supreme Court has adopted the "discovery rule," which "postpone[s] the start of the period of limitations until the injured party knows or reasonably should know of the injury and knows or reasonably should know that the injury was wrongfully caused." *Khan*, 978 N.E.2d at 1028-29. A similar rule is included within the text of the Minnesota statute, which states that the cause of action for fraud "shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the

fraud." M.S.A. § 541.05(1)(6). The Minnesota Supreme Court "judge[s] discovery of the fraud under the reasonable person standard. . . . The facts constituting the fraud are deemed to have been discovered when they were actually discovered or, by reasonable diligence, should have been discovered." *Doe v. Archdiocese of St. Paul*, 817 N.W.2d 150, 172 (Minn. 2012) (internal quotations and citations omitted).

Plaintiff filed the complaint against GECC on October 27, 2014. While GECC's last alleged fraudulent act as part of the Petters Ponzi scheme -- consenting to the termination of the UCC-1 Statements -- occurred on March 3, 2003 (Compl. ¶ 106), Ark did not loan money to Edge One until approximately September 2007 (*Id.* ¶ 117). Ark continued to loan money to Edge One until approximately August 2008, when Edge One ceased payments (*Id.* ¶ 120). Then, on or around September 24, 2008, Ark "became aware that search warrants had been executed at Petters' companies, and ultimately that Petters' supply chain financing business was a fraud" (*Id.* ¶ 121). On October 3, 2008, Mr. Petters was arrested and charged with creating and executing "a scheme and artifice to defraud . . ." and PCI was placed into receivership under 18 U.S.C. § 1345 (*see supra* p. 6).

Thus, plaintiff's own allegations make clear that by early October 2008 -- more than six years prior to filing suit -- Ark knew or with reasonable diligence should have known that its injury (the failure of Edge One to make payments) was the result of wrongful conduct (Mr. Petters's fraud). However, plaintiff claims that this is not enough to trigger the running of the statute of limitations on the claims she asserts against GECC. That is because, according to plaintiff, GECC's alleged involvement in the Ponzi scheme "was not generally known" until October 29, 2009, when Messrs. Feehan and Morrone testified at Mr. Petters's criminal trial (Compl. ¶ 26). Plaintiff goes one step further in her response brief, contending that GECC

"concealed its active role in the Ponzi Scheme until Feehan testified at the Criminal Fraud Trial . . ." (Pl.'s Resp. at 28).

Using October 29, 2009, as the date the cause of action accrued, plaintiff argues that her claims are timely under Minnesota's six-year statute of limitations and Illinois's five-year statute of limitations since the complaint was filed less than five years later, on October 27, 2014 (Pl.'s Resp. at 27-29). For its part, GECC contends that under the discovery rule, the statute of limitations began to run by September 24, 2008, when Ark admits it became aware that Petters' companies were under criminal investigation for fraud (Def.'s Mem. at 25). If plaintiff's cause of action accrued on September 24, 2008, then under either Minnesota's or Illinois's statute of limitations, plaintiff's claim would be time-barred because it was filed more than six years later, on October 27, 2014.

Pursuant to the Illinois discovery rule, the statute of limitations begins to run when the plaintiff knows or should have known that he or she was injured and that the injury was wrongfully caused; the clock starts running at that time even if a plaintiff does not know of a specific defendant's negligent or fraudulent conduct. *Castello v. Kalis*, 816 N.E.2d 782, 793 (Ill. App. 2004) (citing *Knox College v. Celotex Corp.*, 430 N.E.2d 976 (Ill. 1981)). "[T]he burden is on the injured person to inquire further as to the possible existence of a cause of action." *Khan*, 978 N.E.2d at 1029. The Illinois Appellate Court recently applied the discovery rule in another Petters-related case to affirm dismissal of a plaintiff's conspiracy and aiding and abetting fraud claims against a law firm based on the statute of limitations. In *Ritchie Capital Mgmt., L.L.C. v. Fredrickson & Byron, P.A.*, the court held that the statute of limitations began to run when the plaintiff learned that Mr. Petters had been indicted and that its injury had been "wrongfully caused," because the plaintiff could have discovered the possibility that the law firm was a

potential source of its injury "through diligent inquiry." No. 14-2067, 2015 WL 1445681, at *12 (Ill. App. Mar. 27, 2015).

The Minnesota Supreme Court has not specifically addressed whether knowledge of facts sufficient to start the statute of limitations running must include the identity of a particular defendant. However, its description of the discovery rule suggests that the Minnesota Supreme Court would follow the same approach adopted in Illinois. The Minnesota Supreme Court has stated that under the discovery rule, "the cause of action accrues and the statute of limitations begins to run only when the plaintiff knows or should know of the injury." *Antone v. Mirviss*, 720 N.W.2d 331, 335 (Minn. 2006). This description is akin to the Illinois court's holding that the statute of limitations to begin to run when the plaintiff knows or should have known that he or she was injured and that the injury was wrongfully caused. *See also Alliance Bank v. Dykes*, Nos. A12-0455, A12-0485, A12-0486, 2012 WL 6734457, at *15 (Minn. App. Dec. 31, 2012) (the plaintiff bears the burden of proving that it could not "discover the facts constituting the fraud until within six years before the commencement of the action"). When applying state law on an issue the state supreme court has not addressed, "we are called upon to predict how that court would decide if presented with the same question." *Wilson v. City of Chicago*, 758 F.3d 875, 880 (7th Cir. 2014). We therefore conclude that if it considered the issue squarely, the Minnesota Supreme Court would endorse the same rule that applies under Illinois law: that the statute of limitations begins to run when a plaintiff has reason to know an injury was wrongfully caused, even if the plaintiff at that time does not know any or all of those who caused the injury.

As of September 24, 2008, Edge One had stopped payments to Ark, and Ark knew that Mr. Petters's companies were under criminal investigation. By October 3, 2008, Mr. Petters had been arrested and charged with fraud going back as early as January 2000, and his companies

were placed into receivership. At that point, Ark knew it had been injured and that the injury was wrongfully caused. The statute of limitations began to run at that point even if Ark did not know that GECC played a part in any wrongdoing. Six years was ample time to obtain that information and to take action.[6]

Therefore, we find that plaintiff has pleaded facts showing that the claims in her complaint are barred by the statute of limitations under either Illinois or Minnesota law. This provides an additional basis to dismiss the complaint.

## CONCLUSION

For the foregoing reasons, we grant defendant's motion to dismiss (doc. # 40).[7] The case is terminated.

**ENTER:**

SIDNEY I. SCHENKIER
**United States Magistrate Judge**

**DATE: July 27, 2015**

---

[6]In addition to the discovery rule, plaintiff mentions "the doctrine of equitable tolling" without any citation to case law (Pl.'s Resp. at 28). "Generally, the doctrine of equitable tolling permits a court to excuse a plaintiff's failure to comply with a statute of limitations where because of disability, irremediable lack of information, or other circumstances beyond his control, the plaintiff cannot reasonably be expected to file suit on time." *Williams v. Bd. of Review*, 948 N.E.2d 561, 56 (Ill. 2011) (internal quotations and citations omitted); *see also Egge v. Depositors Ins. Co.*, No. A07-150, 2007 WL 2703137, at *3 (Minn. App. Sept. 18, 2007) (holding that equitable tolling of a limitations period is not appropriate when no circumstances beyond the plaintiff's control prohibit service of a complaint within the statutory period). Plaintiff has not attempted to show that these requirements for equitable tolling were met. Indeed, in two other fraud suits filed by creditors in the Petters bankruptcy proceedings against GECC, the plaintiffs alleged that they knew of GECC's relationship with Mr. Petters when they agreed to loan money to a Petters company in 2001, *see* Complaint at 21-22, *Greenpond South LLC, v. Gen. Elec. Capital Corp.*, No. 14-1214 (D. Minn. Apr. 21, 2014), ECF No. 1, Ex. A, and in 2003, *see Palm Beach*, 517 B.R. at 337-40.

[7]Because we dismiss the case on these grounds, it is unnecessary for us to rule on defendant's argument that plaintiff's complaint fails to state a claim for conspiracy or aiding and abetting fraud.